UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HERMAN MICHAEL COVARRUBIAS,

                    Petitioner,

          v.

ROBERT GOWER,

                    Respondent.

Case No.  13-cv-04611-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.     INTRODUCTION

Herman Covarrubias filed this *pro se* action for a writ of habeas corpus under 28 U.S.C. § 2254.  The Court dismissed two claims and issued an order to show cause why the writ should not be granted as to eighteen other claims asserted in the petition.  Respondent has filed an answer and Mr. Covarrubias has filed a traverse.  For the reasons explained below, the petition will be **DENIED**.

## II.     BACKGROUND

Herman Covarrubias and Esperanza Valverde were husband and wife mortgage brokers, operating Summit Mortgage One mortgage brokerage.  According to Mr. Covarrubias, the "essence of the charges" was that he "(1) misrepresented the terms and costs of loans to borrowers; (2) misrepresented the borrowers' income and employment information to the lenders; and (3) forged three documents."  Docket No. 1 at 38.  The California Court of Appeal described the crimes:

> A prospective borrower engages the services of a mortgage broker to work with wholesale lenders on the borrower's behalf. The wholesale lender's loan representative works directly with the broker, not the borrower. The broker submits a loan application and

**United States District Court**
For the Northern District of California

other documentation on behalf of the borrower to the wholesale lender's loan representative. This documentation is then forwarded to the wholesale lender's loan underwriter, who makes the decision whether to fund the loan. The purpose of the underwriting process is to ensure that the borrower will be able to repay the loan.

This case involved five wholesale lenders: Argent Mortgage Corporation (Argent), BNC Mortgage (BNC), Downey Savings and Loan (Downey), WMC Mortgage (WMC), and World Savings (World). These lenders relied on the information on the loan applications and documentation submitted by brokers to determine whether the borrowers would be able to repay the loans. Where the application was for a "stated income" loan, the lender relied on the broker to ensure that the borrower's stated income was accurate. [Footnote omitted.] Typically, the underwriter would issue a conditional loan approval that required further documentation. The loan would not actually be funded until the conditions were met.

Because the broker's fees are funded from the total loan amount, the borrower ends up paying those fees. Typically the broker's fee is 1 percent of the loan amount, but it may legally be as high as 5 percent. The wholesale lender may require a longer prepayment penalty period if the broker's fee is high in order to ensure that the lender profits from the loan. The borrower on a refinancing transaction had the legal right to cancel the transaction within three days after signing the documents.

Defendants acted as brokers on numerous transactions with these five wholesale lenders. These were subprime loans. Subprime loans include stated income loans, loans to borrowers with poor credit scores, and loans with high loan-to-value ratios. Many of the borrowers represented by defendants did not speak or read English, could not read the documents (which were always in English), and did not understand the details of the transactions. Defendants lied to these borrowers about the amounts of their fees and misrepresented the terms of the loans. Valverde notarized backdated deeds of trust in order to prevent the borrowers from exercising their rights to cancel refinancing transactions. Defendants prepared and submitted loan applications that misrepresented the borrowers' income and assets, and forged documents to support those applications.

*People v. Valverde, et al.,* Cal. Court of Appeal No. H034263, July 25, 2012 opinion ("Cal. Ct. App. Opinion") at 2-4.

Following a jury trial in Santa Clara County Superior Court, Mr. Covarrubias was convicted of 19 counts of grand theft and three counts of forgery, with sentence enhancements for excessive takings. He was sentenced to 19 years and 8 months in state prison in May 2009.[1]

---

[1] Ms. Valverde also was convicted of numerous crimes, and received a sentence of 23 years and eight months in state prison. Her federal petition for writ of habeas corpus was denied on November 25, 2015. *See Valverde v. People of The State Of California*, No. C 13-5353 LHK.

Mr. Covarrubias appealed.  In July 2012, the California Court of Appeal affirmed the conviction, and in November 2012, the California Supreme Court denied his petition for review. Mr. Covarrubias also filed a petition for writ of habeas corpus in the state courts.  The California Court of Appeal and the California Supreme Court denied his habeas petitions.

On September 12, 2013, Mr. Covarrubias filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The petition alleged twenty claims: (1) the trial court's refusal to grant Mr. Covarrubias' discovery request for, and the trial court's exclusion of, evidence of a general industry practice of lending to unqualified borrowers denied Mr. Covarrubias his federal constitutional rights to due process and to present a defense; (2) Mr. Covarrubias' right to due process was violated because the evidence was insufficient to support the sentence enhancements under California Penal Code sections 186.11 and 12022.6 for excessive taking; (3) the trial court violated Mr. Covarrubias' Sixth and Fourteenth Amendment rights by failing to instruct the jury as to the definition of a "loss" in the sentence enhancement allegations; (4) "the court abused its discretion when it sentenced [Mr. Covarrubias] to the term of 19 years and 8 months," Docket No. 1 at 13; (5) the use of false evidence to convict Mr. Covarrubias deprived him of his federal constitutional right to a fair trial; (6) the search and seizure were illegal, in violation of Mr. Covarrubias' Fourth Amendment rights; (7) Mr. Covarrubias' federal right to due process was violated because the jurors were exposed to general news about the collapse of the financial markets but the trial court would "not allow[] evidence on how the subprime market really worked," *id.* at 6; (8) Mr. Covarrubias' right to due process was violated by the prosecutor's misconduct, *id.*; (9) Mr. Covarrubias' federal constitutional right to a fair trial was violated because the "prosecutor deliberately misled defense about the theory of [Mr. Covarrubias'] guilt," *id.* at 7; (10) Mr. Covarrubias' right to due process was violated because Mr. Covarrubias "was convicted on the basis of facts different than those facts on which charges were based," and the indictment was changed at the end of trial, *id.*; (11) Mr. Covarrubias' right to due process was violated by a vindictive prosecution; (12) Mr. Covarrubias' right to due process was violated because the "prosecutor sent people to the federal government to open a civil case" against Mr. Covarrubias as a tactic to deplete him of his resources and ability to properly defend himself, *id.* at

8; (13) Mr. Covarrubias' right to due process was violated by the bad faith destruction of potentially exculpatory evidence; (14) Mr. Covarrubias' right to due process was violated because the prosecutor stopped or edited undercover surveillance tape; (15) Mr. Covarrubias was deprived of his constitutional right to a fair trial because the trial judge was biased; (16) the cumulative effect of the errors deprived Mr. Covarrubias of a fair trial; (17) Mr. Covarrubias was deprived of his Sixth Amendment right to effective assistance of counsel when counsel "didn't use evidence against alleged victims," *id.* at 11; (18) Mr. Covarrubias' right to due process and Eighth Amendment rights were violated because "a single conspiracy was unconstitutionally used to impose a sentence for multiple conspiracies," *id.*; (19) Mr. Covarrubias was deprived of his Sixth Amendment right to effective assistance of counsel in that counsel failed to call William Russell to testify; and (20) Mr. Covarrubias' right to due process was violated because the prosecutor misled the jury about Mr. Covarrubias' involvement in loan transactions and a conspiracy.

Claim 4 was dismissed in an earlier order because it was a state law error claim and did not allege the violation of petitioner's rights under the Constitution, laws or treaties of the United States.  Claim 6 was dismissed in the same order because it was for a Fourth Amendment violation and barred by *Stone v. Powell*, 428 U.S. 465, 481-82, 494 (1976).  Docket No. 15 at 3-4.

The Count found cognizable the other eighteen claims for relief and issued an order to show cause.  Respondent has filed an answer and Mr. Covarrubias has filed a traverse, a supplement to the traverse, and an addendum to the supplement to the traverse  The matter is now ready for a decision on the merits.

### III.    JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Clara County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.    STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in

United States District Court
For the Northern District of California

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

Section 2254(d) generally applies to unexplained as well as reasoned decisions.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

decision of [the U.S. Supreme] Court." *Id.* at 102.

## V. <u>DISCUSSION</u>

A. <u>Procedural Default</u>

Although a few of Mr. Covarrubias' claims were presented on direct appeal, many of his claims were first presented to the California Supreme Court in a *pro se* habeas petition. The California Supreme Court summarily rejected his petition in an order that stated: "The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal. 4th 464, 474; *In re Waltreus* (1965) 62 Cal. 2d 218, 225; *In re Dixon* (1953) 41 Cal. 2d 756, 759; *In re Swain* (1949) 34 Cal. 2d 300, 304.)" Docket No. 22 at 217. These citations stand for the following procedural rejections: habeas claims must be pled with particularity (*Duvall*); any issue raised on appeal and rejected cannot be renewed in habeas (*Waltreus*); failure to raise an issue on direct appeal that could have been raised on direct appeal bars its review in habeas (*Dixon*); and the claims have not been pled with particularity (*Swain*).

Respondent contends that six of the claims in Mr. Covarrubias' federal habeas petition are procedurally defaulted because the California Supreme Court cited *In re Dixon*, 41 Cal. 2d at 759. Respondent argues that the *Dixon* rule "has been deemed adequate and independent by the Ninth Circuit and several district courts in California." Docket No. 37-1 at 11. Petitioner does not respond to the argument.

A federal court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds." *Id.* at 729-30. A "discretionary state procedural rule can serve as an adequate ground to bar federal habeas review." *Beard v. Kindler*, 558 U.S. 53, 60 (2009). A state procedural bar is "independent" if the state court explicitly invokes the procedural rule as a separate basis for its decision and the application of the state procedural rule does not depend on a consideration of federal law. *Vang v. Nevada*,

**United States District Court**
For the Northern District of California

329 F.3d 1069, 1074-75 (9th Cir. 2003).  An "adequate" state rule must be "firmly established and regularly followed."  *Walker v. Martin*, 562 U.S. 307, 316 (2011).  The state bears the burden of proving the adequacy of a state procedural bar.  *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir. 2003).

An ambiguous order imposing a procedural bar does not preclude federal collateral review, however.  *See Calderon v. U.S. Dist. Ct. (Bean)*, 96 F.3d 1126, 1131 (9th Cir. 1996) (California Supreme Court order that did not specify which of 39 claims was barred by which of several state rules considered ambiguous and therefore insufficient to preclude federal collateral review).  When a state court opinion summarily denies more than one claim with a citation to more than one state procedural bar, the order is ambiguous as to which bar applies to which claim; as a result, none of the claims are procedurally defaulted if any one of the state procedural bars is not adequate and independent.  *See Washington v. Cambra*, 208 F.3d 832, 833-34 (9th Cir. 2000).

The California Supreme Court's order denying Mr. Covarrubias' habeas petition was ambiguous as it identified multiple procedural bars to the claims in the petition but did not specify which bar(s) applied to which claim(s).  Because of that ambiguity, there is not a procedural default unless *all* of the procedural bars imposed are independent and adequate.  Respondent had the burden of proof on that matter, *see Bennett*, 322 F.3d at 585-86, but did not satisfy his burden.  Respondent's implicit suggestion that, as long as one of the procedural bars is adequate, all the claims are procedurally barred is at odds with the holding of *Washington v. Cambra*, which requires respondent to show that all the procedural bars cited are adequate.  Because Respondent has not shown that all the procedural bars mentioned in the California Supreme Court's order are adequate and independent, this Court cannot find that any of the claims denied by that order are procedurally defaulted.

B.    Claims 1 and 7: Refusal To Allow Discovery and Exclusion of Evidence Of General
       Industry Practice

Mr. Covarrubias alleges that the trial court's refusal to grant a defense discovery request for evidence from another government investigation of other lenders, and the trial court's exclusion of evidence of a general industry practice of lending to unqualified borrowers, denied Petitioner his

federal constitutional rights to due process and to present a defense.

    1.    Background

Argent Mortgage Corporation ("Argent") was one of the lender-victims in the Valverde/Covarrubias criminal case. ACC Capital Holdings Corporation ("ACCCH") was the parent corporation of Argent. ACCCH also was the parent corporation of several other financial institutions, including Ameriquest Mortgage Company, Town & Country Credit Corporation, and AMC Mortgage Services (collectively referred to as "the Ameriquest parties"). *See* CT 3703.

In 2006, the California Attorney General and the district attorneys of several counties, not including Santa Clara County, filed an action against ACCCH and the Ameriquest parties for improper lending practices, including preparing false loan applications and misrepresenting loan terms and fees to borrowers. *See* CT 3691. Argent was not a defendant in that action. The Attorneys General of other states also filed similar actions, and eventually numerous states (including California) reached a settlement with ACCCH and the Ameriquest parties. *See* CT 3703-3756. Under the settlement agreement, ACCCH and the Ameriquest parties did not admit to any wrongful conduct but agreed to make $295,000,000 in payments to former borrowers, to pay costs of the investigation for the settling States, and to make full and correct disclosures to borrowers in the future.

Ms. Valverde filed a motion to compel discovery in the Valverde/Covarrubias criminal case of "all evidence obtained during [the People's] investigation of ACCCH and the Ameriquest Parties" because it would show that Argent was not a victim of Ms. Valverde's conduct. CT 3687. At the time of the motion, the defense in the Valverde/Covarrubias criminal case already had the 11-page complaint and the 48-page settlement agreement from that 2006 action. The prosecutor opposed the discovery motion, arguing that the information sought was not material to and had no bearing on Argent's conduct. The prosecutor also urged that the prosecution did not have the requested evidence because Santa Clara County was not one of the governmental entities that brought the 2006 action against ACCCH and the Ameriquest parties. The trial court denied the discovery motion without explanation.

The lending practices of third parties came to the trial court's attention again shortly after

8

United States District Court
For the Northern District of California

1    the trial began, as described by the California Court of Appeal:

2

3        After trial commenced, the prosecution filed a motion in limine
         seeking exclusion of evidence of "fraudulent conduct by Ameriquest
4        Mortgage Company," an ACCCH subsidiary that was not involved
         in any of the charged offenses. This motion was prompted by the
5        defense's mention of "Ameriquest" in their opening statements. The
         prosecution had objected during the opening statements, but its
6        objection had been overruled. The prosecution argued that such
         evidence would be irrelevant and should be excluded under
7        Evidence Code section 352 because it would confuse the jury.
         Defendants opposed the motion on the ground that the evidence in
8        question would be relevant to the credibility of the prosecution's
         witnesses and to "the issue of lenders' reliance on loan
9        submissions."

10       Before the trial court ruled on the prosecution's motion, Tami
         Carnes, who had worked for Argent throughout the relevant period,
11       and had previously worked for Ameriquest, began her testimony.
         She testified on direct that Argent is a wholesale lender. Argent's
12       parent company is ACCCH. Carnes testified that Argent relied on
         the information on the loan application to determine the borrower's
13       "credit worthiness." Argent depended on the broker "to do the due
         diligence on the information" that the broker provided to Argent.
14       Her testimony was interrupted due to scheduling difficulties.

15       Before Carnes resumed her testimony, the court held a hearing on
         the prosecution's motion. The court repeatedly asked Valverde's trial
16       counsel: "What evidence do you have through discovery or other
         purposes that business practice [of Ameriquest] was the business
17       practice of Argent...." The court noted that the motion to exclude
         was aimed solely at evidence concerning Ameriquest, not evidence
18       concerning Argent. "THE COURT: You can ask her [Carnes] about
         the lending practices at Argent. [¶] MR. UBHAUS [Valverde's trial
19       counsel]: I want to ask her about the lending practices when she was
         at Ameriquest." "THE COURT: ... You can't even ask about
20       Ameriquest unless [and] until the witness says that Argent followed
         the same practices of Ameriquest." "THE COURT: But why would
21       you make any argument that the other lenders accepted anything less
         than what they should have or they didn't rely on the information?
22       [¶] MR. UBHAUS: That's something we'll do two months from
         now. [¶] THE COURT: But why would you be able to do it at all?
23       [¶] MR. UBHAUS: I don't know."

24       The court ruled "that the defendants are precluded from arguing or
         asking questions to show the alleged misconduct of other lenders
25       again until relevance of that is shown." "[A]bsent a further showing
         of relevance, again there will not be argument that other lenders
26       engaged in unlawful conduct...." The court "preclude[d] the
         defendants from asking questions about Ameriquest's lending
27       practices or referring to the litigation that other prosecution or other
         agencies filed against ACC Holdings Corporation or the settlement
28       in that case until there's a requisite showing that Argent followed
         the same lending practices as Ameriquest." Valverde's trial counsel

> responded to this ruling by saying that he "assume[d]" that he could "explore with Ms. Carnes her employment relationship, the relationship between Ameriquest and Argent without getting into it." The court responded: "Well, again, the foundation showing actually have the same lending practices." Valverde's trial counsel responded: "Right. I understand."
>
> After this ruling, Carnes resumed her testimony. On cross by Valverde's trial counsel, Carnes testified that "Ameriquest and Argent ... were completely different systems, different executives, different presidents, different HR, different buildings. I don't know—after I left in 2000 with Ameriquest—I don't know what Ameriquest did...." She denied that she was "familiar with what happened at Ameriquest." "I only dealt with Argent loans." Carnes explained that her work at Ameriquest was "in the back end. I didn't work in the branch office at Ameriquest." She "did certain underwriting for a particular product of loans" at Ameriquest. Carnes had never done any underwriting for Argent.
>
> Out of the presence of the jury, during a break in Carnes's testimony on cross, the court reiterated: "the defendants are required to show that Ameriquest's lending practices were the same as Argent's lending practices before going into ... Ameriquest's lending practices...." The court offered to hold an Evidence Code section 402 hearing, but Valverde's trial counsel declined. "[I]n light of Ms. Carnes' answer, she doesn't know anything about Ameriquest's lending practices, it would be a pointless exercise." On redirect, Carnes reaffirmed that Argent relied on the documentation submitted by the brokers. She also confirmed that she was familiar with Argent's underwriting policies.

Cal. Ct. App. Opinion at 6-8.

On appeal, Mr. Covarrubias and Ms. Valverde argued that the discovery ruling and the evidentiary ruling violated their rights to due process and to present a defense. They argued that this evidence would have allowed them (a) to show an industry practice of making loans to unqualified borrowers to rebut any claimed reliance by lenders on misrepresentations by Mr. Covarrubias and Ms. Valverde and (b) to assert that Mr. Covarrubias and Ms. Valverde lacked the specific intent to steal because it could be inferred that they were aware of this industry practice.

The California Court of Appeal rejected these arguments "for the simple reason that the information sought by the discovery motion and the evidence excluded by the trial court was not relevant or material to any of the issues before the jury." Cal. Ct. App. Opinion at 9.

> The flaw in defendants' argument is that none of the information sought by the discovery motion concerned any of the lenders in this case or even any wholesale lenders at all, and therefore it had no "discernible exculpatory value." Every one of the lenders in this

United States District Court
For the Northern District of California

case was acting as a wholesale lender in the course of its interactions with defendants. Wholesale lenders do not deal directly with borrowers, but deal solely with brokers. The information sought in the discovery motion concerned solely retail lenders, who lend directly to borrowers and do not deal with brokers. The alleged misconduct at issue in the civil action concerned only the direct interactions between retail lenders and borrowers. The misrepresentations at issue in this case to which defendants claimed the information sought was relevant were by brokers, not lenders or borrowers, to wholesale lenders, not retail lenders or borrowers. There was simply no basis for a belief that information about the alleged practices of retail lenders vis-à-vis borrowers would lead to exculpatory evidence relevant to the practices of wholesale lenders vis-à-vis brokers. Consequently, the trial court did not err in denying the discovery motion.

As to the court's evidentiary ruling, defendants contend that "industry practice" evidence would have been admissible to rebut the prosecution's alleged reliance on the "assum[ption]" that "if the bank made the loan, it must have relied on [defendants'] representations." This broad contention ignores the narrowness of the trial court's ruling. The trial court's order excluded evidence concerning the lending practices of Ameriquest, one of ACCCH's retail lender subsidiaries, because there had been no foundational showing that any of the wholesale lenders involved in this case engaged in similar practices. The court's order left open the possibility that such evidence could be admitted if defendants made the requisite foundational showing, which defendants conceded they could not make.

The other aspect of the trial court's evidentiary ruling was its exclusion of evidence that "other lenders" engaged in unlawful practices absent a foundational showing of relevance. "We review for an abuse of discretion a trial court's exclusion of evidence." ( People v. Brady (2010) 50 Cal.4th 547, 558.) Defendants never made any attempt to lay a foundation for the admission of evidence that the misconduct of lenders uninvolved in this case had any relevance to the conduct of the lenders who were involved in this case. Due to the absence of such a foundation, the trial court did not abuse its discretion in excluding evidence that had not been shown to have any probative value and that would have been confusing to the jury and unduly time consuming. (Evid. Code, § 352.)

Cal. Ct. App. Opinion at 5-11.

> 2.   Analysis

The U.S. Constitution gives a criminal defendant the right to present a defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted). The Compulsory Process Clause of the Sixth

United States District Court
For the Northern District of California

Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness. *Washington v. Texas*, 388 U.S. 14, 19 (1967). The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973); *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute). A defendant "'does not have an unfettered right to offer [evidence] that is incompetent, privileged or otherwise inadmissible under standard rules of evidence.'" *Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (plurality opinion) (alteration in original) (quoting *Taylors*, 484 U.S. at 410). Even relevant evidence may be excluded on account of certain evidentiary rules. *See id.* at 42. "[T]o say that the right to introduce relevant evidence is not absolute is not to say that the Due Process Clause places *no* limits upon restriction of that right;" rather, it means that the defendant has the heavy burden to show that the decision to exclude evidence "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* at -42-43 (citation omitted). Even if the exclusion of evidence was a constitutional error, habeas relief is not available unless the erroneous exclusion had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

"Only rarely [has the Supreme Court] held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013).[2] There, the Supreme Court identified four cases where it had found such a violation: *Holmes v. South Carolina*, 547 U.S. 319 (2006); *Rock v. Arkansas*, 483 U.S. 44 (1987); *Chambers v. Mississippi*, 410 U.S. 284 (1973); and *Washington v. Texas*, 388 U.S. 14

---

[2] In *Nevada v. Jackson*, the Supreme Court reversed the Ninth Circuit's decision granting habeas relief for a petitioner who was barred from presenting extrinsic evidence of the victim's prior accusations of sexual assault at petitioner's trial for rape. The Ninth Circuit was faulted for viewing the Supreme Court's cases on the right to present a defense at too high a level of generality. *See id.* at 1994. Although the Supreme Court had held that various restrictions on a defendant's ability to cross-examine a witness violate the Confrontation Clause, the Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." *Id.* "The Ninth Circuit elided the distinction between cross-examination and extrinsic evidence by characterizing the cases as recognizing a broad right to present 'evidence bearing on [a witness'] credibility.'" *Id.* (alteration in original).

(1967).

In *Holmes v. South Carolina*, 547 U.S. 319, the Supreme Court held that a criminal defendant's right to present a defense was violated by an evidence rule under which a defendant could not introduce proof of third-party guilt if the prosecution had introduced forensic evidence that, if believed, would strongly support a guilty verdict. The constitutional problem was that the general rule (i.e., allowing a defendant to offer evidence of third-party guilt if the evidence was inconsistent with his own guilt and was not speculative) had been "radically" changed by the South Carolina Supreme Court to be contingent on the strength of the prosecution's case. *Id.* at 328. That radical change caused South Carolina's rule to cease to rationally serve the end that the general rule was "designed to promote, i.e., to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." *Id.* at 330.

In *Rock v. Arkansas*, 483 U.S. 44, the Supreme Court held that Arkansas' *per se* rule excluding all hypnotically enhanced testimony was unconstitutional when used to restrict a defendant's right to testify. There, the Court explained that "[a] State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." *Id.* at 61.

In *Chambers v. Mississippi*, 410 U.S. 284, the Supreme Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling witnesses who would have testified that another witness made trustworthy, inculpatory statements on the night of the crime.[3] It was the combination of the rigid application of the State's evidence rules and the

---

[3] *Chambers* was unusually fact-specific. In *Chambers*, a third party had confessed to the murder, and later recanted. Chambers called the third party as a witness, the third party denied responsibility for the murder, and the prosecution established in cross-examination that the third party had recanted his confession. Unusual and outdated state law evidence rules that the defendant vouched for the third party because he had called him as a witness precluded Chambers from effectively questioning or cross-examining the third party to impeach his recantation. *Chambers*, 410 U.S. at 295-97; *see id.* at 296 (Mississippi's vouching rule has little purpose in modern criminal trials because parties generally must "take [their witnesses] where they find them"). Other evidence of the third party's guilt was excluded because the state's declaration-

**United States District Court**
For the Northern District of California

fact that the proffered evidence bore considerable assurances of trustworthiness and reliability that led to the due process violation in *Chambers*. *See id.* at 302-03. The Supreme Court specifically pointed out that its holding did not "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Id.*

The challenged rule in *Washington v. Texas,* 388 U.S. at 14, provided that principals, accomplices and accessories in the same crime could not be used as witnesses for each other. 388 U.S. at 15. This rule violated a defendant's right to compulsory process because "the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." *Id.* at 23.

The California Court of Appeal's rejection of Mr. Covarrubias' claim was not contrary to, or an unreasonable application of, these Supreme Court holdings.[4] Mr. Covarrubias has not

---

against-interest exception to the hearsay rule did not apply to declarations against *penal* interests. *Id.* at 298-300. The hearsay statements in *Chambers* were made and offered at trial "under circumstances that provided considerable assurance of their reliability," i.e., the confessions were made spontaneously to a close acquaintance shortly after the murder; each one was corroborated by other evidence, including the third party's sworn confession and testimony of eyewitnesses; each statement was self-incriminatory and unquestionably against the confessor's self interests; and the declarant (i.e., the third party) was in court and could have been cross-examined at Chambers' trial. *Id.* at 300-01.

[4] Mr. Covarrubias' other cited cases, *Crane v. Kentucky*, 476 U.S. 683 (1986), and *Davis v. Alaska*, 415 U.S. 308 (1974), also do not show his entitlement to relief, as both of those cases concerned the exclusion of essential defense evidence.

In *Crane*, 476 U.S. 683, the Supreme Court held that the defendant's constitutional right to present a defense was violated where the state court excluded evidence using a rigid state procedural rule to exclude evidence essential to the defense. There, Kentucky had a rule that a pretrial determination that a confession was voluntary was conclusive and could not be relitigated at trial. *Id.* at 686-87. The trial court had applied this rule to exclude evidence about the circumstances of the defendant's confession where the defense wanted to present the evidence to undermine the credibility of that confession. The Supreme Court explained that the state court wrongly assumed that "evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories." *Id.* at 687. Contrary to the state court's assumption, the same evidence about the "manner in which a statement was extracted" may be relevant to both the legal question (for the judge) of the statement's voluntariness, as well as the "ultimate factual issue" (for the jury) of the defendant's guilt. *Id.* at 688-89. The State's "blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial," by excluding "competent

United States District Court
For the Northern District of California

identified any Supreme Court holding to the effect that the right to present a defense includes a

right to present *irrelevant* evidence.  The requirement that evidence must be relevant to be

admissible is a fundamental rule of evidence, and is found in both the Federal Rules of Evidence

and the California Evidence Code.  *See* Fed. R. Evid. 402 ("Irrelevant evidence is not

admissible"); Cal. Evid. Code § 350 ("No evidence is admissible except relevant evidence").  Mr.

Covarrubias also has not identified any Supreme Court holding to the effect that an evidence rule

that (like California Evidence Code section 352) allows the exclusion of evidence when its

probative value is outweighed by issue confusion or undue time-consumption violates the

constitutional rights to present a defense or due process.[5]  Mr. Covarrubias has failed to show that

either of the California rules at issue -- i.e., the rule excluding irrelevant evidence, and the rule

allowing exclusion of evidence where the probative value is outweighed by a prejudicial effect --

"offend[] some 'fundamental principle of justice'" such that the rule itself violates a criminal

---

reliable evidence bearing on the credibility of a confession when such evidence is central to the
defendant's claim of innocence" and without any countervailing valid state justification for its
exclusion.  *See id.* at 690.  By contrast, at Mr. Covarrubias' trial, the evidence excluded was of
third-party practices excluded under the most commonplace of evidentiary rules: the requirements
that evidence be relevant and that its probative value not be outweighed by issue confusion or
undue time-consumption.

In *Davis v. Alaska*, 415 U.S. 308, the state's crucial identification witness was on probation
after having been adjudicated a juvenile delinquent.  The Supreme Court held that the defendant's
Sixth Amendment right to cross-examine the witness was violated when the state court prohibited
any reference to the witness' juvenile adjudication pursuant to a state policy protecting the
anonymity of juvenile offenders.  *Id.* at 310-11.  Due to the critical role of this witness, and the
serious damage to the State's case that might have been done if the jury believed the witness had
made a faulty identification due to worries about his own probation, "the right of confrontation is
paramount to the State's policy of protecting a juvenile offender."  *Id.* at 319.  By contrast, Mr.
Covarrubias was not attempting to cross-examine an essential witness with a prototypical showing
of bias, nor was the evidence excluded under a policy concern unrelated to the value of the
evidence.

[5] California Evidence Code section 352, like its federal analog, Federal Rule of Evidence 403, is a
rather commonplace kind of evidentiary rule allowing the exclusion of evidence where its
probative value is substantially outweighed by the probability that its admission will necessitate
undue consumption of time, be unduly prejudicial, confuse the issues or mislead the jury.  Section
352 itself does not offend due process or the right to present a defense.  *Cf. Delaware v. Van
Arsdall*, 475 U.S. 673, 679 (1986) ("trial judges retain wide latitude insofar as the Confrontation
Clause is concerned to impose reasonable limits on such cross-examination based on concerns
about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or
interrogation that is repetitive or only marginally relevant"); *Montana v Egelhoff*, 518 U.S. at 42
(citing Federal Rule of Evidence 403 as an example of "familiar and unquestionably constitutional
evidentiary rule[s]" that "authorize the exclusion of relevant evidence.")

1    defendant's right to due process.  *See Montana v. Egelhoff*, 518 U.S. at 43.

2         It is debatable whether the above-mentioned Supreme Court precedents could support a

3    finding of a violation of the right to present a defense based on a routine application of an

4    otherwise permissible rule.  The California Court of Appeal may have determined that the right to

5    present a defense is only implicated if the rule itself, or the combined effect of several rules, is

6    unconstitutional  Because "fairminded jurists could disagree" on whether the right-to-present-a-

7    defense cases extend to the routine application of an otherwise permissible rule, such as the rule

8    requiring evidence to be relevant to be admissible, the California Court of Appeal's rejection of

9    the claim would not support relief under § 2254(d).  *See Harrington v. Richter*, 562 U.S. at 101;

10   *see also id.* at 103 (petitioner must show the state court's decision "was so lacking in justification

11   that there was an error well understood and comprehended in existing law beyond any possibility

12   for fairminded disagreement").

13        Even assuming *arguendo* that the right to present a defense could be violated by the state

14   court's application of a rule that did not itself violate a constitutional right, Mr. Covarrubias still

15   would not be entitled to relief because the state court's application of the two rules was not

16   unreasonable.  The California Court of Appeal reasonably determined that Mr. Covarrubias had

17   not shown the relevance of the evidence he wanted to obtain through discovery and to introduce at

18   trial.  This was not third party culpability evidence, as Mr. Covarrubias was not trying to show that

19   some third party committed the crimes of which he was accused.  Instead, he wanted to show that

20   third parties in a field that was related to -- but, critically, not the same as -- the business of the

21   lender-victims in this case engaged in particular practices and that one victim-lender's corporate

22   parent and corporate sisters engaged in particular practices.

23        The California Court of Appeal reasonably concluded that the discovery request for

24   evidence from a different case brought against victim-lender Argent's corporate parent and

25   corporate sisters was properly denied.  Argent's corporate parent and corporate sisters engaged in

26   a different type of lending business than Argent, and information about their retail lending

27   practices was not exculpatory to the mortgage-broker defendants in this action who interacted with

28   wholesale lenders including Argent.  The evidence requested in discovery was not shown to have

impeachment value due to the difference in the lending businesses, with Argent being a wholesale lender and the third parties being in the retail-lending business.

The California Court of Appeal also reasonably upheld the trial court in the latter's insistence that the defendants show a nexus between the practices of third parties and the lender-victims in this case before evidence of the third parties' lending practices could be admitted -- a showing that defendants conceded they could not make. The state court's requirement that the defendants be able to lay a foundation showing the relevance of a nonparty's conduct and practices before admitting that evidence was not an unreasonable application of any Supreme Court precedent.

The state appellate court's decision to uphold the exclusion of the evidence under California Evidence Code section 352 also was not an unreasonable application of clearly established federal law. Due to the defense's inability to lay a foundation that the misconduct of lenders uninvolved in this case was relevant to any victim-lender in this case, the evidence was excluded because of the undue consumption of time and issue confusion that would occur it the evidence was admitted. The evidence about other lenders' practices did not have a high probative value as to Mr. Covarrubias' guilt on the charges based on his representations to wholesale lenders. The trial court was rightly concerned about the trial getting side-tracked on the collateral issues that the defense could only speculate were connected to the lending practices of the victim-lenders in this case. Allowing evidence about other lenders' practices would have consumed an undue amount of time in that it would have been necessary to prove that those other lenders engaged in practices that the defense wanted to attribute to the wholesale lenders in this action.[6] And allowing evidence about other lenders' practices created a substantial risk of confusing the

---

[6] The discussion in the trial court focused on the efforts to show practices of ACCCH and the Ameriquest parties. The trial court was quite concerned that, due to the settlement agreement in the 2006 action that contained a provision stating that ACCCH and the Ameriquest parties did not admit liability, the allegations of the complaint against ACCCH and the Ameriquest parties would have to be proved, and that would result in a trial within this trial. *See* RT 736, 738, 742, 746 , 750. The court did allow the defense to question the Argent witness about Argent's lending practices, but explained that the defense "can't even ask about Ameriquest unless until the witness says that Argent followed the same practices of Ameriquest." RT 747, *see also* RT 742, 744, 749 ("there's no evidence [Argent and Ameriquest are] join[ed] at the hip yet").

United States District Court
For the Northern District of California

1    jury because it would require development of evidence about the operations of other companies,

2    and require development of evidence about the differences and similarities between their business

3    practices and the defendants' business practices.  There is no indication that the prosecution would

4    have conceded that all lenders act alike, so that point would have had to be established through

5    possibly many witnesses.  Efforts to draw parallels between third-party lending practices and the

6    retail lender-victims likely would have resulted in a mini-trial (about lending practices of

7    wholesale and retail lenders, and the soundness of those practices) within a trial (of the guilt of

8    Mr. Covarrubias and Ms. Valverde) that would have taken much time and would have been very

9    confusing to the jury.  The differently-situated nature of the two groups (retail vs. wholesale

10   lenders) and the separate corporate existence (Argent vs. Argent's parent and sister corporations)

11   gave the state court reasonable cause for concern about issue confusion and time-consumption.

12   The exclusion of the evidence under section 352 did not make the trial fundamentally unfair.

13           The state appellate court's rejection of the claims that Mr. Covarrubias' right to present a

14   defense and right to due process were violated by the discovery and evidence rulings was not

15   contrary to or an unreasonable application of clearly established federal law on the constitutional

16   right to present a defense.  Mr. Covarrubias is not entitled to the writ on these claims.

17   C.      Claims 2 and 3: Due Process Violations Regarding Excessive Takings Enhancements

18           Mr. Covarrubias received a longer prison term because the jury found true two sentence

19   enhancement allegations for excessive taking.  Mr. Covarrubias contends in Claim 2 that his right

20   to due process was violated because the evidence was insufficient to support these sentence

21   enhancements.  *See* Docket No. 1 at 4.  In Claim 3, he contends that the trial court violated his

22   Sixth and Fourteenth Amendment rights by failing to properly instruct the jury as to the definition

23   of a "loss" in these sentence enhancement allegations.  *See* Docket No. 1 at 13.  As the California

24   Court of Appeal explained, although cast as challenges to the sufficiency of the evidence and to

25   the adequacy of jury instructions, Mr. Covarrubias' challenges "actually revolve around [his]

26   interpretation of the word 'loss' in section 12022.6.  Thus, the issue is one of statutory

27   construction."  Cal. Ct. App. Opinion at 12.

28

**United States District Court**
For the Northern District of California

1       1.     <u>Background</u>

2         a.    <u>The Sentence Enhancement Statutes</u>

3      Mr. Covarrubias received a sentence enhancement of four years under California Penal

4 Code section 12022.6(a)(4).  At the time of Mr. Covarrubias' crimes in 2002-2004, that section

5 provided:

6

7           When any person takes, damages, or destroys any property in the
          commission or attempted commission of a felony, with the intent to

8           cause that taking, damage, or destruction, the court shall impose an
          additional term as follows: . . . (4) If the loss exceeds two million

9           five hundred thousand dollars ($2,500,000), the court, in addition
          and consecutive to the punishment prescribed for the felony or
          attempted felony of which the defendant has been convicted, shall

10           impose an additional term of four years.

11 Cal. Penal Code § 12022.6(a)(4) (1998 version).  Shorter sentence enhancements were provided

12 under the statute for lesser losses, i.e., one year for a loss exceeding $50,000, two years if the loss

13 exceeded $150,000, and three years if the loss exceeded $1,000,000.  *Id.* at § 12022.6(a)(1)-(3).

14      Mr. Covarrubias also received a three-year sentence enhancement under California Penal

15 Code section 186.11(a)(2).  At the time of Mr. Covarrubias' crimes in 2002-2004, section

16 186.11(a) provided:

17

18           Any person who commits two or more related felonies, a material
          element of which is fraud or embezzlement, which involve a pattern

19           of related felony conduct, and the pattern of related felony conduct
          involves the taking of more than one hundred thousand dollars

20           ($100,000), shall be punished, upon conviction of two or more
          felonies in a single criminal proceeding, in addition and consecutive

21           to the punishment prescribed for the felony offenses of which he or
          she has been convicted, by an additional term of imprisonment in

22           the state prison as specified in paragraph (2) or (3).

23 Cal. Penal Code § 186.11(a)(1) (2002) version).  Paragraph 2 provided: "If the pattern of related

24 felony conduct involves the taking of more than five hundred thousand dollars ($500,000), the

25 additional term of punishment shall be two, three, or five years in the state prison."  Cal. Penal

26 Code § 186.11(a)(2) (2002 version).  Paragraph 3 of the statute provided that, if the crimes

27 "involve[] the taking of" more than $100,000 and less than $500,000, the punishment will be that

28 imposed by section 12022.6.  Cal. Penal Code § 186.11(a)(3) (2002 version).

United States District Court
For the Northern District of California

b.      Court of Appeal's Decision

Mr. Covarrubias argued in the California Court of Appeal that the section 12022.6(a)(4) enhancement was not supported by any evidence that his offenses caused a "loss" exceeding $2.5 million, as required by the statute because the *net* loss to the lenders was less than $2.5 million when one took into account the value of the collateral they received on the loans they made.  Mr. Covarrubias argued that the term "loss" in section 12022.6(a)(4) meant "net loss," and required the section 12022.6(a)(4) calculation to be made by deducting from the face amount of the loans the value of the secured interest the lenders received.  He also argued that the trial court prejudicially erred in failing to specially instruct the jury on the "net loss."

After reviewing the legislative history of the statute, the California Court of Appeal rejected Covarrubias' arguments, and determined as a matter of state law that "loss" in section 12022.6(a)(4) did not mean "net loss" and instead was properly calculated as the face value of the loans made as a result of Mr. Covarrubias' criminal conduct.  *See* Cal. Ct. App. Opinion at 14-15. The face value of the loans was in excess of $2.5 million, and therefore the loss met the requirement for the section 12022.6(a)(4) enhancement.  "[D]efendants' taking of the loan amounts (a permanent dispossession) satisfied section 12022.6 even if the lenders might ultimately be able to recover all of their losses someday through the sale of the collateral."  Cal. Ct. App. Opinion at 20.[7]  In light of the state appellate court's "reject[ion of] defendant's interpretation of the word 'loss' in section 12022.6, it naturally follows that no instruction on that incorrect interpretation was required."  Cal. Ct. App. Opinion at 14 n.9.

Mr. Covarrubias made a similar challenge to the section 186.11 enhancement.  He equated the term "taking" in section 186.11 to the term "loss" in section 12022.6(a)(4) and urged that "taking" therefore meant "net loss."  Thus, he reasoned that the jury's finding of true on the

---

[7] One of the three judges on the panel in Covarrubias' appeal filed a concurring and dissenting opinion.  *See* Cal. Ct. App. Opinion at 38-96 (Duffy, J., concurring and dissenting).  Judge Duffy dissented from the holding that the section 12022.6(a)(4) enhancement was properly imposed, and would have reduced the sentence enhancement by two years.  *See id.* at 64-68, 75.  Judge Duffy agreed with the defense argument that the "loss" for purposes of section 12022.6(a)(4) meant the "net loss," which was not in excess of $2.5 million when one took into account the value of the security provided for the residential real property loans.  *See* Cal. Ct. App. Opinion at 67-68.

sentence enhancement allegations was not supported by any evidence that his offenses caused a "loss" exceeding $500,000 for the section 186.11 enhancement.

The California Court of Appeal interpreted section 186.11 under state law, and rejected Mr. Covarrubias' challenge on similar reasoning to that used to reject the challenge to the section 12022.6 enhancement. "Section 186.11, as it read at the time of defendants' crimes, did not refer to any amount of 'loss' but explicitly to 'the taking of' more than $500,000. . . . Since defendants concede that they committed a taking of the face amounts of the loans, which exceeded $2.5 million, they lack any basis for a challenge to the section 186.11 enhancements." Cal. Ct. App. Opinion at 20-21. Judge Duffy concurred with the majority that the section 186.11 enhancement was imposed properly. *Id.* at 75.

### 2. Analysis of Federal Constitutional Claims

#### a. Sufficiency of The Evidence

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338. A federal habeas court applies the standards of *Jackson* with an additional layer of deference under the AEDPA, generally asking whether the state court's decision reflected an unreasonable application of *Jackson* and *Winship* to the facts of the case. *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005); *see, e.g.*, *McDaniel v. Brown*, 558 U.S. 120, 133-34 (2010) (per curiam) (Ninth Circuit erred by failing to review all of the evidence in light most favorable to the prosecution when it resolved inconsistencies in testimony in favor of petitioner).

1    Mr. Covarrubias' challenge to the sentence enhancements is largely about the definition of

2  "loss," as he argues that "loss" in California Penal Code section 12022.6 meant "net loss."  And he

3  argues that "taking" in section 186.11 equated to "loss" and therefore meant "net loss."  The

4  California Court of Appeal rejected Mr. Covarrubias' interpretation of the statutes as a matter of

5  state law.  The California Court of Appeal's interpretation of California law is binding in this

6  federal habeas action.  *See Hicks v. Feiock*, 485 U.S. 624, 629-30 (1988).  That is, this Court's

7  analysis begins with an acceptance that the law of California was that a "loss" under section

8  12022.6(a)(4) did not mean "net loss" and instead meant the amount improperly *taken* by a

9  criminal defendant rather than the "net" amount that any victim actually lost.  And this Court's

10  analysis begins with an acceptance that the law of California was that a "taking" under section

11  186.11 did not mean "loss" or "net loss."  Here, those determinations of state law meant that the

12  "loss" in section 12022.6(a) and the "taking" in section 186.11(a) referred to the face value of the

13  loans, with no offset for the amount of any security that may have been received for those loans by

14  the lender.

15    Mr. Covarrubias does not dispute that the face value of the loans obtained from the lender-

16  victims amounted to more than $2.5 million.  The loan amounts for the crimes of which he was

17  found guilty totaled more than $7.6 million.  See CT 4908.  A rational trier of fact could have

18  found that the loss exceeded $2.5 million for purposes of the section 12022.6(a)(4) enhancement

19  and that there was a taking of more than $500,000 for purposes of the section 186.11(a)

20  enhancement.  The California Court of Appeal's rejection of the challenge to the sufficiency of the

21  evidence on the sentence enhancements was not an unreasonable application of *Jackson* and

22  *Winship* to the facts of the case.

23    b.    Instructional Error Claim

24    Covarrubias' related contention that his Sixth and Fourteenth Amendment rights were

25  violated because the jury instructions on the excessive-taking enhancements misstated the law by

26

27

28

22

not requiring the jury to consider the "net loss" also must be rejected.[8]  As explained above, the

California Court of Appeal determined as a matter of state law that the California sentence

enhancement allegations were not based on the "net loss."  Thus, the California Court of Appeal

found that the jury instructions correctly stated the requirements of the enhancements under state

law and there was no need for an additional instruction.  *See* Cal. Ct. App. Opinion at 14 n.9.  Mr.

Covarrubias had an interesting challenge to the trial court's interpretation of a state statute, but his

challenge was about the meaning of a state statute and that was a matter of state law.  Given the

state court's state law determination of the meaning of the sentence enhancement statutes, Mr.

Covarrubias' federal claim that rests on a different interpretation of the word "loss" must be

rejected.  Mr. Covarrubias had no due process right to a jury instruction that would have misstated

California law.  Nor could a challenge to a jury instruction solely as an error under state law

support federal habeas relief.  "[I]t is not the province of a federal habeas court to reexamine state-

court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see,*

---

[8] The jury received the following instruction on the section 12022.6 allegation:

> If you find either defendant . . . guilty of the grand theft by false
> pretense charges or of attempting to commit grand theft by false
> pretense, you must then decide whether the People have proved the
> additional allegation that the value of the property taken was more
> than $2,500,000. [¶] To prove this allegation, the People must prove
> that: [¶] 1. In the commission or attempted commission of the crime,
> the defendant took property; [¶] 2. When the defendant acted, he or
> she intended to take the property; [¶] AND [¶] 3. The loss caused by
> the defendant's taking the property was greater than $2,500,000.
>
> If you find the defendant guilty of more than one crime, you may
> add together the loss from each crime to determine whether the total
> loss from all the crimes was more than $2,500,000 if the People
> prove that: [¶] A. The defendant intended to and did take property in
> each crime; [¶] AND [¶]  B. Each crime arose from a common
> scheme or plan.
>
> The value of property is the fair market value of the property.
>
> The People have the burden of proving this allegation beyond a
> reasonable doubt. If the People have not met this burden, you must
> find that the allegation has not been proved.
>
> Loss includes any dispossession of property, which includes letting
> defendant or another person take ownership of the property.

CT 4676.

United States District Court
For the Northern District of California

1    *e.g., Stanton v. Benzler*, 146 F.3d 726, 728 (9th Cir. 1998) (state court's "state law determination"

2    that arsenic trioxide is a poison as a matter of law and not an element of crime for jury

3    determination "is not open to challenge on habeas review").

4          The California Court of Appeal's rejection of Mr. Covarrubias' challenge to the

5    sufficiency of the evidence and the jury instructions on the excessive-taking sentence

6    enhancements was not contrary to, or an unreasonable application of, clearly established law as set

7    forth by the U.S. Supreme Court.  Mr. Covarrubias is not entitled to the writ on these claims.

8    D.     The Pervasive Problem With Conclusory And Unsupported Allegations

9          Before turning to the other claims, the Court takes a moment to note that the quality of the

10   presentation differs markedly between the claims discussed above and those discussed in the

11   following sections.  The claims discussed above are claims that were briefed by appellate counsel

12   on direct appeal.  The claims discussed in the following sections were presented in the state court

13   in a petition for writ of habeas corpus written by Mr. Covarrubias, who was not represented by

14   counsel after the conclusion of direct review.

15         Many of Mr. Covarrubias' claims discussed in the following sections consist of only one or

16   two sentences in his federal habeas petition, with minimal descriptions of the facts in support of

17   the claims.  A similar lack of detail permeated the only state court petition raising these same

18   claims (i.e., Mr. Covarrubias' petition for writ of habeas corpus to the California Supreme Court).

19   *See* Docket No. 22 at 181-210.  Additionally, Mr. Covarrubias submitted several filings suggesting

20   he thought there would be essentially a second trial in federal court to determine whether his state

21   court criminal trial was fair, and that he planned to develop and present evidence at a later time to

22   show the unfairness of his state court trial.

23         The Court issued several orders, the substance of which made clear to Mr. Covarrubias that

24   he was in a now-or-never sort of position in terms of the need to present his claims and the factual

25   support therefor.  First, in an order denying Mr. Covarrubias' request for an investigator, the Court

26   explained that the restrictions imposed by 28 U.S.C. § 2254 and *Cullen v. Pinholster*, 563 U.S.

27   170 (2011), severely limit a habeas petitioner's ability to present new evidence in federal court.

28   *See* Docket No. 23 at 3-5.  That same order also explained that discovery is very limited in habeas

24

United States District Court
For the Northern District of California

1    actions.  *Id.* at 4.  Second, in an order denying a discovery request, the Court again noted the

2    limited nature of discovery in habeas actions and explained that the role of a habeas court is not to

3    hold a trial and consider evidence to determine Mr. Covarrubias' guilt anew.  Docket No. 36.

4    Third, in an order denying another request by Mr. Covarrubias to conduct discovery and for an

5    evidentiary hearing, the Court noted that Mr. Covarrubias "appears to be laboring under the

6    mistaken notion that this Court will be holding a trial and considering evidence to determine his

7    guilt anew."  Docket No. 43.  The Court again mentioned the restrictions of § 2254 and the limited

8    nature of discovery in federal actions.  *Id.*

9         Most recently, after Mr. Covarrubias filed his traverse, the Court required him to file a

10   supplemental brief due to the inadequate presentation of his claims other than those claims that

11   had been presented by counsel on direct appeal.  *See* Docket No. 47.  The Court explained that it

12   had been hindered greatly in its efforts to adjudicate the merits of the claims by the conclusory

13   nature of the petition and traverse.  The Court identified numerous assertions that were deficient

14   "in that they are both generalities and made without citation to any particular page(s)" of the

15   14,000+ page record.  *Id.* at 1-2 & n.1.  The Court also reminded Mr. Covarrubias that his

16   "insistence in his traverse that he will develop and explain the evidentiary basis for his claims at a

17   later time is unwise in light of the Court's earlier denial of his requests for an investigator,

18   discovery and an evidentiary hearing, as well as the Court's explanation about the stringent

19   limitations imposed by 28 U.S.C. § 2254(d) and (e) on this Court's review of a habeas petition."

20   *Id.* at 2.  The Court directed Mr. Covarrubias to file a supplemental brief that described the facts

21   supporting each claim and cited to the particular pages in the reporter's transcript and the clerk's

22   transcript that support that claim.  *Id.* at 3.

23        Mr. Covarrubias then filed a supplemental brief (Docket No. 50) and an addendum to the

24   supplemental brief (Docket No. 52).  These two documents did little to clarify most of the claims

25   in the petition.  Although he submitted excerpts of the record that purportedly pertained to some of

26   his claims, review of those excerpts is largely unhelpful to understand the actual habeas claims.

27   Mr. Covarrubias also represented in several places that he would investigate and prove his claims

28   at a later date.  *See, e.g.,* Docket No. 52 at 3, 6.

The foregoing portion of the procedural history of the case is mentioned to provide some background for the rejections of several claims in the following sections due to inadequate argument and/or inadequate factual support.  Mr. Covarrubias was on notice of the need to provide more than conclusory allegations and the need to do so now, yet he was unwilling or unable to do so.

E.     Claims 5 and 8: Use Of "False Evidence"

In Claim 5, Mr. Covarrubias contends that "false evidence was used to convict," in violation of his federal constitutional right to a fair trial.  Docket No. 1 at 5.  In Claim 8, he contends that the prosecutor engaged in misconduct by presenting this false evidence.  Mr. Covarrubias asserts that, at trial, the district attorney "showed a lot of exhibits and evidence from Box 36 that was taken from our home. This was not possible because box 36 was left behind at our house" after the search warrant was executed.  Docket No. 1 at 177.

This claim was presented in a state habeas petition and denied without discussion by the California Supreme Court.  When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

A fundamental principle guiding the conduct of the prosecutor, as the representative of a sovereign in this country, is "not that it shall win a case, but that justice shall be done."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  From this principle flow the rules that the prosecutor may not hide evidence and may not let false evidence go uncorrected at trial.  *Cf. Strickler v. Greene*, 527 U.S. 263, 280-82 (1999).  When a prosecutor obtains a conviction by the use of testimony which he knows or should know is perjured, the conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury.  *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (same result obtains when State, although not soliciting false evidence, allows it to go uncorrected when it

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

appears).  This principle applies to matters of witness credibility as well as direct evidence of guilt.  *See Napue*, 360 U.S. at 269.  A claim under *Napue* requires a showing that (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony or evidence was actually false, and (3) the false testimony or evidence was material.  *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013).  Conclusory assertions will not suffice.  *See id.* (finding that petitioner's conclusory assertion that any testimony inconsistent with the truth must be not only inaccurate but also perjured, does not constitute evidence sufficient to make out a *Napue* claim).

For a *Napue* claim, false testimony or evidence is material if there is "any reasonable likelihood" that the false testimony or evidence "could have affected the judgment of the jury." *United States. v. Agurs*, 427 U.S. 97, 103 (1976).  "This materiality standard is, in effect, a form of harmless error review, but a far lesser showing of harm is required under *Napue*'s materiality standard than under ordinary harmless error review.  *Napue* requires [the court] to determine only whether the error *could* have affected the judgment of the jury, whereas ordinary harmless error review requires [the court] to determine whether the error *would* have done so." *Dow v. Virga*, 729 F.3d 1041, 1048 (9th Cir. 2013) (citations omitted).

Mr. Covarrubias' false-evidence claim fails on all three prongs.  First, his efforts to demonstrate that false evidence was presented fall woefully short of the mark.  He does not identify any particular document that he knows was falsified.  Instead he reasons that, since documents that were used purportedly came from Box C36, and he believes Box C36 was not taken during the March 23, 2005 search, the documents purportedly from Box C36 are false.[9]  But his effort to show that Box C36 was not taken is utterly unpersuasive. He presents photos allegedly taken before and after the district attorney's investigator searched his home on March 23, 2005.  Docket No. 1 at 5, 172-175.  The "before" picture shows a garage wall with shelves

---

[9] A District Attorney's investigator testified that the investigators seized about 67 boxes on March 23, 2005, and that he put large post-its on the boxes indicating the location and the number of the box. *See* Docket No. 50 at Ex. 8.  Boxes with the letter "C" on them were taken from the garage.  The documents were eventually Bates-stamped with an alphanumeric code that included information to designate the search warrant used to obtain a document as well as the location from which the document was obtained.

United States District Court
For the Northern District of California

containing many numbered boxes, including one marked "C36," whereas the "after" picture has an unlabeled box on a different shelf in a different part of the wall in the garage.  Mr. Covarrubias contends that the unlabeled box in a different area of the garage is Box C36.  He has not persuasively shown that the unlabeled box is Box C36; more importantly, he has not shown that any evidence used at his trial actually was false.[10]  Mr. Covarrubias' *Napue* claim fails because he has failed to show that false evidence was presented at his trial. Second, Mr. Covarrubias has failed to establish that the prosecution knew or should have known that the testimony presented was false.  Third, he has not demonstrated that the allegedly false evidence was material.  Mr. Covarrubias has not shown that the number of the box from which any particular document came was material, and has made no effort to show the falsity or materiality of the content of any of the documents from Box C36.  In light of his failure to establish any of the three required elements of a *Napue* claim, the state court's rejection of the claim plainly was not contrary to, or an unreasonable application of, *Napue*.

F.      Claim 7: Jury Exposure To News About Financial Markets

        Mr. Covarrubias contends in Claim 7 that his federal right to due process was violated because the jurors were exposed to general news about the collapse of the financial markets but the trial court would "not allow[] evidence on how the subprime market really worked."  Docket No. 1 at 6.

        This claim appears to have two parts.  First, the claim repeats the argument made in Claim 1 and discussed in Section B, above, that the defense was not allowed to show lending industry practices.  This portion of the claim was rejected in Section B, above.

        Second, the claim also can be understood as a claim that Mr. Covarrubias was harmed by

---

[10] Mr. Covarrubias attempts to prove that the evidence was "false" by presenting excerpts of testimony from several borrowers who were questioned about documents.  The documents were identified for the trial record by the prosecutor using the Bates-stamp and number code applied by the prosecution team to indicate the source of the document.  For example, borrower Laura Fermin was asked about "a handwritten loan application, Bates SW1-36-C 36-3 ending in 107 to 109."  Docket No. 52 at Ex. 14 (RT 5276).  This evidence may support an inference that the document came from the box labeled Box C36, but does not show it to be false evidence.  Mr. Covarrubias does not show that Box C36 was not taken with the other boxes, and makes no effort to show that the documents themselves (such as the handwritten loan application referred to by Ms. Fermin) were false documents.

1    the jury's exposure to general publicity about the lending industry.  This portion of the claim fails

2    for lack of any evidentiary support.  The only evidence Mr. Covarrubias identifies to support his

3    claim is Exhibit F to the petition.  Exhibit F is a declaration from his attorney in support of a new

4    trial motion.  The only press coverage mentioned in Exhibit F is a segment on "60 Minutes" that

5    aired on February 15, 2009 and mentioned World Savings Bank.  Docket No. 1 at 180.  The

6    transcript of that segment is attached to the declaration.  Insofar as Claim 7 can be understood as a

7    claim about publicity affecting the jury verdict, the claim fails for lack of evidentiary support.  The

8    "60 Minutes" story was not aired until four months after the verdict was returned on October 10,

9    2008.  It can be said with certainty that a story that aired four months after the verdict did not

10   cause or influence that verdict.  Mr. Covarrubias' conclusory allegation that the jury was exposed

11   to general news about the collapse of the financial markets is insufficient to warrant habeas relief.

12   *See Boehme v. Maxwell*, 423 F.2d 1056, 1058 (9th Cir. 1970) (rejecting habeas claim based on

13   prejudicial newspaper publicity because the petitioner had not made a record in federal court or

14   state court showing that publicity).

15        Even if Mr. Covarrubias could show that there was substantial press coverage of the

16   collapse of the financial markets at or before the time of his trial, that alone would not support

17   habeas relief.  A criminal defendant has a constitutional right to be tried by "a panel of impartial,

18   'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  But "juror *impartiality* [the

19   Supreme Court has] reiterated, does not require *ignorance*."  *Skilling v. United States*, 561 U.S.

20   358, 381 (2010).  As the Supreme Court noted in *Skilling*, "[p]rominence does not necessarily

21   produce prejudice."  *Id.*  Thus, it would not be enough to show merely that the lending industry

22   was prominent in the news; instead, it would be necessary to show that such news coverage had

23   the effect of depriving Mr. Covarrubias of his right to an impartial jury.  He comes nowhere close

24   to doing so.  He is not entitled to relief on this claim.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir.

25   1994) ("conclusory allegations which are not supported by a statement of specific facts do not

26   warrant habeas relief").

27   G.    Claims 8 and 11: Prosecutorial Misconduct/Vindictive Prosecution

28        Next, Mr. Covarrubias challenges the prosecutor's actions in the grand jury proceedings.

29

United States District Court
For the Northern District of California

Mr. Covarrubias contends in Claim 8 that his right to due process was violated by the prosecutor's misconduct in "knowingly misleading jurors about Ventura's fix rate option." Docket No. 1 at 6. He urges that, 'during the Grand Jury, D. A. told the Jury that Loretta Ventura didn't have a fix rate option in her contract," whereas the prosecutor knew that there was "a fix rate option in her loan contract." *Id.* at 176.[11] In Claim 11, he alleges that the prosecutor purposely showed false evidence to the grand jury that the prosecutor misleadingly attributed to Ms. Valverde. *Id* at 8.

These claims are foreclosed by the Supreme Court's decision in *United States v. Mechanik*, 475 U.S. 66, 70-71 (1986), which held that a guilty verdict after trial renders harmless any error in the grand jury proceedings. The guilty verdict on an indictment "means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *Id.* at 70; *see, e.g., id.* at 70-71 (no relief for alleged deficiency in grand jury proceedings that resulted in two government agents being questioned and testifying in tandem, rather than one at a time); *see also People of Territory of Guam v. Muna*, 999 F.2d 397, 399 (9th Cir. 1993) (citing *Mechanik* and denying relief on claim that prosecutor failed to comply with Guam's requirement that prosecutor submit to the grand jury evidence in his possession that tends to negate guilt). There is an exception to the general rule such as where there is racial and gender discrimination in the grand jury selection process, *see Mechanik*, 475 U.S. at 70-71 n.1, *United States v. Bingham*, 653 F.3d 983, 998-99 (9th Cir. 2011), but Mr. Covarrubias has failed to demonstrate his allegations fit within such exception.

Claim 11 is captioned "vindictive prosecution." Docket No. 1 at 8. Mr. Covarrubias appears to use the term "vindictive" in the lay sense (e.g., a mean-spirited or spiteful prosecution), but that is not actionable. The term "vindictive prosecution" is a legal term of art that refers to prosecutorial charging decisions made to punish a defendant for exercising his constitutional or

---

[11] The portion of Claim 8 that repeats allegations about the Box 36 evidence and the warrantless raid that occurred on the mortgage office is dismissed for the same reason Claim 6 was rejected in the order to show cause: *Stone v. Powell*, 428 U.S. 465, 481-82, 494 (1976), bars review of Fourth Amendment claims in habeas.

United States District Court
For the Northern District of California

1    statutory rights.  *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).  The defendant has the

2    burden to show that "charges of increased severity were filed because the accused exercised a

3    statutory, procedural, or constitutional right in circumstances that give rise to an appearance of

4    vindictiveness."  *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1168 (9th Cir. 1982).

5    However, "the Supreme Court has repeatedly noted that charging decisions generally rest entirely

6    within the prosecutor's discretion, *e.g., Bordenkircher*, 434 U.S. at 364, that the exercise of that

7    discretion is presumed to be lawful, *Banks* [*v. Dretke*,  540 U.S. 668, 696 (2004)], and that this

8    presumption can only be overcome with exceptionally clear proof, *McCleskey* [*v. Kemp*, 481 U.S.

9    279, 297 (1987)]."  *Nunes v. Ramirez-Palmer*, 485 F.3d 432, 441 (9th Cir. 2007).  Mr.

10   Covarrubias has not alleged any facts suggesting that the prosecutor increased the charges against

11   him in response to his exercise of any statutory or constitutional right.

12          Due to the guilty verdict against Mr. Covarrubias, the alleged errors in the grand jury

13   proceedings are deemed harmless beyond a reasonable doubt.  *See Mechanik*, 475 U.S. at 70-71.

14   And he has not alleged any facts suggesting that there was vindictive prosecution.  Mr.

15   Covarrubias is not entitled to the writ on these claims.

16   H.     Claims 9 and 10: Prosecutor Misled Defense About Prosecution Theory

17          In Claim 9, Mr. Covarrubias alleges that his right to a fair trial was violated because the

18   "prosecutor deliberately misled defense about the theory of [Mr. Covarrubias'] guilt," and "the

19   indictment charge was changed" at the end of trial.  Docket No. 1 at 7.  In Claim 10, Mr.

20   Covarrubias alleges that there was a "variance" and he was "convicted on the basis of facts

21   different than those facts on which charges were based."  *Id.*

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1.      Background[12]

The corrected first amended indictment accused the defendants of grand theft against the borrowers *and* lenders in seventeen counts of the corrected first amended indictment.  For example, Count 5 alleged:  "The Grand Jury of the County of Santa Clara, State of California, hereby accuses ESPERANZA ISABEL VALVERDE, HERMAN MICHAEL COVARRUBIAS and CAYETANO ALBERTO DE LA ROSA, of a felony, namely: a violation of PENAL CODE SECTION 484-487(a) [GRAND THEFT OF PERSONAL PROPERTY OF A VALUE OVER FOUR HUNDRED DOLLARS], in that on or about and between March 15, 2004 and April 15, 2004, in the County of Santa Clara, State of California, the said defendants did unlawfully take personal property, Money, of a value exceeding four hundred dollars ($400.00), *the property of Joseph and Yolanda Hidalgo and BNC Mortgage*."  CT 3881 (brackets and capitalization as in original; italics added).

Toward the end of trial, Ms. Valverde and Mr. Covarrubias moved for a dismissal or acquittal on the seventeen counts alleging grand theft against the borrowers and the lenders.  CT 4410.  They argued that the indictment suffered from duplicity in that these counts joined one or more distinct offenses in a single count because each of the challenged counts alleged grand theft from a borrower *and* grand theft from a lender.  *See* CT 4413.

The prosecutor opposed the motion, arguing that pleading more than one offense in a single count was permissible under state law, and that the defendants had waived any objection to this form of pleading by failing to file a demurrer before trial.  *See* CT 4457-60.  The prosecutor suggested that any potential problem identifying the conduct that formed the basis for each conviction could be avoided by giving a unanimity instruction to the jurors and using special

---

[12]Respondent notes that the only actual amendment of the indictment was done before rather than after trial, and that amendment was limited to dismissing one charge against Ms. Valverde. Respondent also summarizes in his brief the duplicity problem discussed in the text of this order. Having reviewed Mr. Covarrubias' bare-bones assertions, this Court concludes that Mr. Covarrubias' claims pertain to the duplicity problem rather than the pretrial amendment.  If, in fact, he was trying to complain about the actual amendment of the indictment to delete one charge against a codefendant, his claim fails because he does not explain how the dismissal of one charge against his codefendant caused any violation of his own rights.

United States District Court
For the Northern District of California

1  verdict forms.  CT 4463.

2  　　　The trial court denied the defense motion for dismissal or acquittal on the seventeen

3  challenged counts of the indictment, and granted the prosecution's requests for a unanimity jury

4  instruction and special verdict forms.  RT 6857-68.  The trial court stated that, had the defense

5  filed a demurrer, the prosecutor properly could have amended the indictment because an

6  amendment would not have changed the offense charged.  RT 6859.  The "[o]ffense of grand theft

7  against the borrowers and against the lenders were charged and found by the grand jury.  Breaking

8  into two separate counts would not change the offense charged."  RT 6859; *see* RT 6861.  The

9  court stated that, for the counts alleging grand theft against borrowers and lenders, the jury would

10  be given a unanimity instruction and special verdict forms "to determine if they find grand theft

11  against the lenders and then grand theft against the borrowers.  And that has been the theory of the

12  case throughout. . . .  The defense defended in those counts against the claims of grand theft

13  against the borrowers and claims of grand theft against the lenders."  RT 6861-62.

14  　　　At trial, the written jury instructions provided to the jurors had a chart showing the various

15  charges against the several defendants and, among other things, listed the applicable borrower in

16  one column and lender in another column for the various crimes, including the grand theft charges.

17  CT 4636.  The court instructed the jury on the elements of the grand theft offenses (CT 4668-

18  4670), and gave the following instruction on the need for a unanimous verdict:

19

20  　　　　　The defendants are charged with theft by false pretense in certain
counts for the period of time alleged in each count.  The People

21  contend that they have presented evidence of more than one act to
prove that the defendant committed this offense.  You must not find

22  the defendant guilty unless you all agree that the People have proved
that the defendant committed at least one of these acts and you all

23  agree on which act he or she committed for any particular count. [¶]
In addition, in each count of Counts 3, 5, 7, 15, 21, 23, 24, 26, 28,

24  29, 31, 33, 38, 41, 43, 44, and 46, the People contend that they have
presented evidence of more than one crime of grand theft by false

25  pretense, namely grand theft alleged against borrowers as the
victims and grand theft alleged against lenders as the victims.  You

26  must not find a defendant guilty on any such count unless you all
agree that the People have proved that the defendant committed at

27  least one of these two offenses of grand theft by false pretense and
you all agree on which offense he or she committed.

28  CT 4678.

33

United States District Court
For the Northern District of California

Special verdict forms were used that made clear whether the jury had found the defendant guilty of grand theft against the borrower, lender, or both on each of the challenged counts.  For example, the verdict form corresponding to Count 5 against Mr. Covarrubias had one line with options for the jury to find Mr. Covarrubias "guilty" or "not guilty" of "Grand Theft from Joseph and Yolanda Hidalgo," and a separate line with options for the jury to find Mr. Covarrubias "guilty" or "not guilty" of "Grand Theft from BNC Mortgage."  CT 4715.  The jury checked "guilty" on both lines.  *Id.*  (For the sake of clarity, the Court uses Count 5 as an example, but the same analysis applies to all the challenged counts, as parallel language was used in the first amended indictment for all the challenged counts, and for the special verdict forms corresponding to each of those counts.  *See* CT 3879-96 (corrected first amended indictment); CT 4715, 4731, 4741, 4746, 4750, 4755, 4760, 4764, 4769, 4774, 4785, 4794, 4801, 4806, 4815 (special verdict forms for Mr. Covarrubias).  Additionally, although the defendants at trial challenged seventeen counts, only fifteen of those counts apply to Mr. Covarrubias because Count 3 and Count 7 charged only Ms. Valverde.

      2.   <u>Analysis</u>

The joining in a single count of two or more distinct offenses is termed "duplicity," and some courts refer to such a count as a "duplicitous count."  *See United States v. Ramirez-Martinez*, 273 F.3d 903, 913 (9th Cir. 2001), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186, 1191 (9th Cir. 2007).

> The vices of duplicity arise from breaches of the defendant's Sixth Amendment right to knowledge of the charges against him, since conviction on a duplicitous count could be obtained without a unanimous verdict as to each of the offenses contained in the count. A duplicitous indictment also could eviscerate [a] defendant's Fifth Amendment protection against double jeopardy, because of a lack of clarity concerning the offense for which he is charged or convicted.

*United States v. Aguilar*, 756 F.2d 1418, 1420 n.2 (9th Cir. 1985) (citations omitted).  Under both California and federal law, duplicity in a charging document is a defect that should be challenged

**United States District Court**
For the Northern District of California

before trial.[13]

The U.S. Supreme Court has never held that an indictment is deficient under the federal constitution merely because it contains a duplicitous count. *See generally Santilus v. Heath*, 2014 WL 5343817, *2 (E. D. N.Y. 2014) ("The Supreme Court has never held that an indictment containing duplicitous counts violates the Due Process Clause."); *Williams v. Lempke*, 2012 WL 2086955, at *21 (S.D.N.Y. June 1, 2012) ("[Petitioner] has cited, and I have found, no Supreme Court decision clearly prohibiting a duplicitous indictment as a matter of federal constitutional law.")  Mr. Covarrubias also has not identified any lower court case holding that the mere existence of a duplicitous count makes the charging document constitutionally infirm.

At least in the Ninth Circuit, the failure to challenge the duplicity of an indictment before trial does not strip the defendant of his right to later assert a Sixth Amendment challenge to the verdict based on such an indictment.  *See United States v. Savage*, 67 F.3d 1435, 1439 (9th Cir. 1995), *abrogated on other grounds as stated in United States v. Van Alstyne*, 584 F.3d 803, 813 (9th Cir. 2009) (defendant could assert challenge based on Sixth Amendment right to a unanimous jury verdict after trial).

Out of an abundance of caution, this Court therefore will consider whether any of the three potential constitutional dangers inherent in a duplicitous count -- lack of notice of the charges, a non-unanimous jury verdict, or double jeopardy -- materialized in this case.

<u>Right to notice of the charges</u>:  "In all criminal prosecutions, the accused shall enjoy the

---

[13] California Code of Civil Procedure section 1004(3) allows a demurrer on the ground that "more than one offense is charged" and section 1012 provides that, "[w]hen any of the objections mentioned in Section 1004 appears on the face of the accusatory pleading, it can be taken only by demurrer, and failure so to take it shall be deemed a waiver thereof."  *See also* 4 Witkin, Cal. Crim. Law 3d (2000) (Pretrial, § 252, p. 461 ("The reason for the waiver rule is, of course, to permit correction of defects, and to prevent the defendant from speculating on the result of the trial and raising the objection after an unfavorable verdict").

Federal Rule of Criminal Procedure 12(b)(3)(B)(i) lists "joining two or more offenses in the same count (duplicity)" in a federal indictment as a defect in form that must be raised before trial.  Failure to timely file a motion challenging an indictment as defective due to duplicity makes the motion untimely, although the court may consider a late motion if the party shows good cause. Fed. R. Crim. P. 12(c)(3).  "Duplicity in an indictment would constitute reversible error only if [the defendant is] misled 'to his prejudice.'"  *Aguilar*, 756 F.2d at 1422.

United States District Court
For the Northern District of California

1  right . . . to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. This

2  right to notice of what one is being charged with is among the most basic of procedural

3  protections. It is clearly established law for purposes of 28 U.S.C. § 2254(d) that a criminal

4  defendant has a Sixth Amendment right to be informed of any charges against him, and that a

5  charging document, such as an information, is the means by which such notice is provided. *Gautt*

6  *v. Lewis*, 489 F.3d 993, 1004 (9th Cir. 2007) (citing *Cole v Arkansas*, 333 U.S. 196, 201 (1948));

7  *see, e.g., id.* at 1009 (defendant charged under one subsection of a statute could not be sentenced

8  under another subsection that had more requirements and carried a stiffer penalty). To determine

9  whether a defendant has received fair notice of the charges against him, the court looks first to the

10  information, the principal purpose of which is to provide defendant with a description of the

11  charges in sufficient detail to enable him to prepare a defense. *See James v. Borg*, 24 F.3d 20, 24

12  (9th Cir. 1994). An information is not constitutionally defective if it states "'the elements of an

13  offense charged with sufficient clarity to apprise a defendant of what to defend against,'" *Miller v.*

14  *Stagner*, 757 F.2d 988, 994 (9th Cir.) (quoting *Russell v. United States*, 369 U.S. 749, 763-64

15  (1962)), *amended*, 768 F.2d 1090 (9th Cir. 1985). "An explicit citation to the precise statute at

16  issue is best, but a 'brief factual recitation in the information' can also suffice.'" *Gautt,* 489 F.3d

17  at 1004 (quoting *Givens v. Housewright*, 786 F.2d 1378, 1381 (9th Cir. 1986)).

18  Here, the charging document that was operative when trial started was the corrected first

19  amended indictment. The seventeen counts in question charged Mr. Covarrubias (and other

20  defendants) with the felony of grand theft, identified the applicable California Penal Code

21  sections, identified the thing taken as "personal property, Money, of a value exceeding four

22  hundred dollars," identified a time period during which it occurred (e.g., March 15 through

23  April 15, 2004 in Count 5), identified where the crime occurred (e.g., County of Santa Clara in

24  Count 5), and identified the persons/entities from whom the property was taken (e.g., Joseph and

25  Yolanda Hidalgo and BNC Mortgage in Count 5). *See* CT 3881.

26  The corrected first amended indictment sufficiently apprised Mr. Covarrubias of the

27  criminal charges against which he had to defend: he was informed of the crimes by name, the

28  relevant sections of the California Penal Code, the date of the offenses, and the names of the

victims.  Most importantly, Mr. Covarrubias was not charged under one section of the Penal Code and convicted under another.  *Cf. Cole*, 333 U.S. at 202 (due process violated where defendant was charged under one criminal code section but his conviction was upheld under a different criminal code section); *Gautt*, 489 F.3d at 998 (notice was improper where a defendant was charged under one section of the California Penal Code, but convicted under another section, which carried a lengthier sentence).  Mr. Covarrubias was charged with two offenses under each of the seventeen counts, but he has not shown that he did not receive constitutionally adequate notice of each of those two offenses.  In generic terms, the indictment that charged him with grand theft from A and B provided adequate notice of the charge of grand theft from A and of the charge of grand theft from B.  Mr. Covarrubias has not shown that his Sixth Amendment right to notice of the charges was violated.

        <u>Double jeopardy concerns:</u>  A duplicitous count poses the potential for a double jeopardy problem in the future if another prosecution is attempted or a retrial is necessary because a court might not be able to discern from a general verdict whether a defendant has been acquitted of one of the offenses in the count.  The Supreme Court has determined that, even with a general verdict, double jeopardy concerns are eliminated when it can be determined from the jury instructions what conviction(s) the general verdict represents.  *Abney v. United States*, 431 U.S. 651, 664 (1977).  There, the Supreme Court concluded that there was not a double jeopardy potential when the prosecutor undertook to prove both offenses alleged in a duplicitous count and the court instructed the jury that "it would have to find that the Government had established all of the elements of *both* crimes before it could return a verdict of guilty against the petitioners." *Id.*[14]  The

---

[14] In *Abney*, the defendants had been found guilty in a general verdict on an indictment that had a duplicity problem, i.e., the single-count indictment charged defendants with both a conspiracy and an attempt to violate the Hobbs Act.  The Court of Appeals reversed the conviction on an evidentiary issue and instructed the prosecutor to elect one of the two offenses (i.e., conspiracy or attempt) to pursue on remand.  *Abney*, 431 U.S. at 655.  On remand, when the prosecutor elected to proceed on the conspiracy charge, the defendants moved for a dismissal on the ground that retrial was barred by the Double Jeopardy Clause.  *See id.* at 662.  The defendants' reasoning was that the general verdict at the first trial made it impossible to determine whether they had been convicted on the conspiracy or the attempt charge; because it was possible they had been acquitted on the conspiracy charge, the Double Jeopardy Clause prohibited retrial on that count.  *Id.* at 663-64.  The Supreme Court rejected the defendants' argument that the general verdict at first trial barred retrial.  Although a general verdict had been used at the first trial, the prosecutor undertook

**United States District Court**
For the Northern District of California

Supreme Court refused to "assume that the jury disregarded these clear and unambiguous instructions and returned a guilty verdict without first finding that the Government had proved both crimes charged in the indictment beyond a reasonable doubt." *Id.* at 665.

Here, the combined effect of the unanimity instruction and the special verdict forms allow the reader to determine with certainty as to which offenses Mr. Covarrubias was convicted and as to which he was acquitted. No ambiguity exists that could obstruct a double jeopardy analysis if a retrial or further prosecution ever occurred. As in *Abney*, the indictment against Mr. Covarrubias alleged two offenses in one count and the prosecutor undertook to prove both crimes. Also as in *Abney*, there is no reason to depart from the presumption that the jury followed the instructions given. Unlike the instruction in *Abney* (which lumped the two offenses together and required the jury to find proof of both offenses to return a guilty verdict), the trial court here took a better route to avoid any potential confusion, by separating each count into two offenses and requiring a special verdict on each of those two offenses for each of the counts. The jury was instructed that the prosecution had presented evidence of more than one crime of grand theft in each of these seventeen counts and that, to convict, the jury had to be unanimous that Mr. Covarrubias committed at least one of the offenses and had to be unanimous on which offense he committed. Not only did the instructions require unanimity for a guilty verdict on each offense, the verdict forms separated out the offenses so that a reader can determine the result for each crime in each of the challenged counts, i.e., whether Mr. Covarrubias was found guilty or not guilty on the charge of grand theft against the borrower and guilty or not guilty on the charge of grand theft against the lender. There is no double jeopardy concern because there is no ambiguity on the results of the duplicitous counts against Mr. Covarrubias.

Jury trial right: A duplicitous count may threaten a defendant's right to due process and Sixth Amendment right to trial by jury.[15] When a jury returns a verdict of guilty with respect to a

---

to prove both offenses and the district court had instructed that the jurors had to find that the government established all the elements of both crimes before it could return a guilty verdict. *Id.* at 664. There had not been an acquittal, and the Double Jeopardy Clause did not bar the retrial. *Id.*

[15] A defendant in state court has no federal constitutional right to a unanimous jury verdict. *See*

38

duplicitous count, a court cannot always be confident that the jury agreed unanimously with respect to which of the two crimes the defendant committed. *United States v. Savage*, 67 F.3d 1435, 1439 (9th Cir. 1995), *abrogated on other grounds as recognized in United States v. Van Alstyne*, 584 F.3d 803, 813 (9th Cir. 2009). The Supreme Court has not addressed the jury trial issue presented by a duplicitous count. The Ninth Circuit has, however, determined that the solution to the danger of a non-unanimous verdict is that the trial court must "give curative instructions or submit special interrogatories to ensure a unanimous verdict." *United States v. Gordon*, 844 F.2d 1397, 1401 (9th Cir. 1988).

Mr. Covarrubias' trial court did at least as much as that which *Gordon* instructed federal district courts to do with a duplicitous count that had not been challenged before trial. At his trial, the court gave special instructions to the jury *and* used special verdict forms breaking apart the grand theft from the borrower and the grand theft from the lender offenses within each count. The jury instructions informed jurors that more than one crime had been alleged in each of these counts and that the jury could not find him guilty on any one of the counts unless the jury was unanimous that the prosecution proved that he committed at least one of the offenses and was unanimous on which one of the offenses he had committed. The verdict form required a separate guilty/not guilty determination for each of the two offenses in each count.

Mr. Covarrubias has not shown that the California Supreme Court's rejection of his Claims 9 and 10 was contrary to, or an unreasonable application of, any clearly established Supreme Court holding. He is not entitled to habeas relief on these claims.

I.     Claim 12: Prosecution Improperly Communicated With Federal Government

In Claim 12, Mr. Covarrubias contends that his right to due process was violated because the "prosecutor sent people to the federal government to open a civil case" against him as a tactic to deplete him of his resources and ability to properly defend himself. Docket No. 1 at 8.

---

*Apodaca v. Oregon*, 406 U.S. 404, 410-12 (1972). However, California law requires unanimity of verdict from all twelve jurors in a criminal case. *See* Cal. Const. art I, § 16; *People v. Engelman*, 28 Cal. 4th 436, 442 (Cal. 2002). The Ninth Circuit has assumed that a violation of California's unanimity requirement would result in a fundamentally unfair trial in violation of due process. *See generally Smith v. Swarthout*, 742 F.3d 885, 894-95 (9th Cir. 2014); *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).

United States District Court
For the Northern District of California

1    This claim is denied because the allegations are conclusory and speculative.  Even

2  assuming there were communications between the state prosecutor and the "federal government,"

3  Mr. Covarrubias has failed to show any constitutional bar to cooperation between the two

4  sovereigns.  His assertion that the state prosecutor sent people to the "federal government" for the

5  very purpose of depleting his resources appears to be nothing more than speculation.  Conclusory

6  allegations and speculation do not warrant federal habeas relief.  *See James v. Borg*, 24 F.3d at 26

7  ("conclusory allegations which are not supported by a statement of specific facts do not warrant

8  habeas relief").

9  J.    Claim 13: Destruction of Evidence

10    In Claim 13, Mr. Covarrubias contends that his right to due process was violated by the

11  bad faith destruction of potentially exculpatory evidence.  He states in a conclusory manner that

12  police reports were destroyed by the prosecution team so that they would not have to be turned

13  over to the defense.  He points to no evidence to support his argument, and his evidence actually

14  supports a finding that such reports did *not* exist.  His evidence is an excerpt of the trial transcript

15  during which defense counsel argued that it was not credible that there were not police reports on

16  interviews of some borrowers.  The prosecutor responded that the investigators had only provided

17  notes of interviews to her; then, in response to the trial court's inquiry, the prosecutor specifically

18  confirmed that there were no police reports.  RT 3869.

19    The government has a duty to preserve evidence whose exculpatory value is apparent

20  before it is destroyed and that is of such a nature that the defendant cannot obtain comparable

21  evidence by other reasonably available means.  *See California v. Trombetta*, 467 U.S. 479, 489

22  (1984); *see, e.g., id.* at 481 (due process did not require that police preserve breath samples of

23  suspected drunk drivers for results of breath-analysis tests to be admissible).  A different analysis

24  is used if the evidence is only *potentially* useful.  *See Illinois v. Fisher*, 540 U.S. 544, 547-48

25  (2004).  There is no due process violation unless there is bad faith conduct by the police in failing

26  to preserve potentially useful evidence.  *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  Neither

27  *Trombetta* nor *Youngblood* impose a duty to *collect* evidence, but only to preserve it in limited

28  situations.  *See Miller v. Vasquez*, 868 F.2d 1116, 1119 (9th Cir. 1989).

The California Supreme Court did not unreasonably apply controlling Supreme Court precedent in rejecting Mr. Covarrubias' claim that the police destroyed potentially exculpatory evidence. First, he has not shown that the alleged police reports ever existed. A claim that the police failed to *generate* police reports would not support relief because the Supreme Court has not held that there is any duty to collect or generate evidence. Habeas relief is precluded by 28 U.S.C. § 2254(d), which requires the state court's decision to be contrary to or an unreasonable application of Supreme Court precedent. Second, assuming arguendo that Mr. Covarrubias could establish that the police reports existed at some point in time, he would not be entitled to habeas relief because he does not show the "bad faith" failure to preserve those reports that is necessary for a due process violation. *See Youngblood*, 488 U.S. at 58. He is not entitled to habeas relief on this claim.

K.     Claim 14: Prosecutorial Misconduct Regarding A Surveillance Tape

Mr. Covarrubias contends in Claim 14 that the "prosecutor stop[p]ed or edited undercover surveillance tape. This violated Petitioner's right to due process." Docket No. 1 at 9. He states that an "undercover surveillance tape done in the summer of 2004 with Sergio Sanchez was suddenly stop[p]ed or edited." *Id.* In his traverse, Mr. Covarrubias observes that the jury rejected the counts in the indictment pertaining to Sergio Sanchez, Docket No. 45 at 16, but omits to note that he (Covarrubias) was not charged in the counts (i.e., Counts 9-11) in which Sergio Sanchez was identified as the victim. Mr. Covarrubias also speculates that, if the entire tape had been played, "who knows how many more counts would have been dismissed/dropped?" Docket No. 45 at 16.

The appropriate standard of review for a prosecutorial misconduct claim in a federal habeas corpus action is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the inquiry is whether the prosecutor's remarks were improper and, if so, whether the comments infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). The "*Darden* standard is a very

general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (omission in original) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The California Supreme Court's summary rejection of this claim was reasonable in light of the complete absence of any argument or showing as to how the alleged misconduct by the prosecutor rendered Mr. Covarrubias' trial "fundamentally unfair." *Darden*, 477 U.S. at 181. Mr. Covarrubias fails to provide any showing that the prosecutor edited the tape, and fails to explain what the allegedly unrecorded or redacted portion of the tape would have revealed. The Court also notes that, although Mr. Covarrubias affirmatively states in his federal petition that the prosecutor stopped or edited the tape, his state habeas petition only alleged that as a possibility. *See* Docket No. 22 at 202 (alleging that the "prosecutor possibly edited" the tape, and "request[ing] a professional to review the tape to see if it has been edited.") Mr. Covarrubias does not allege in his federal petition that someone has examined the recording and determined that it *was* edited, and has not otherwise explained the basis for his current assertion that the prosecutor actually did something to the recording.

L.     Claim 15: Judicial Bias Regarding A Surveillance Tape

Mr. Covarrubias contends that "Judicial bias contributed to [his] conviction." Docket No. 1 at 10. The "judicial bias" allegedly consisted of the trial judge's refusal to allow all of the undercover surveillance recording to be played for the jury.

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *In re Murchison*, 349 U.S. 133, 136 (1955); *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702, 709 (9th Cir. 1989). In a habeas action, the inquiry is whether "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion," *Liteky v. United States*, 510 U.S. 540, 555 (1994).

Here, Mr. Covarrubias has failed to show that the "judicial bias" was anything other than a routine evidentiary ruling. Petitioner alleged that the judge "did not allow all of a D.A.

United States District Court
For the Northern District of California

1    undercover surveillance tape to be played." Docket No. 1 at 10. He did not, however, identify

2    where in the record this ruling was made or what the judge's exact ruling was. This claim is

3    typical of the conclusory/unsubstantiated nature of most of petitioner's claims, as discussed above

4    in Section D.[16]

5            Because Mr. Covarrubias has failed to show that the ruling on the surveillance recording

6    rendered his trial fundamentally unfair, the rejection of the claim by the California Supreme Court

7    thus could not have been contrary to, or an unreasonable application of, clearly established United

8    States Supreme Court authority.

9    M.    Claim 16: Cumulative Error

10           Mr. Covarrubias contends that the cumulative effect of the errors prevented him from

11   receiving a fair trial. In some cases, although no single trial error is sufficiently prejudicial to

12   warrant reversal, the cumulative effect of several constitutional errors may still prejudice a

13   defendant so much that his conviction must be overturned. *See Alcala v. Woodford,* 334 F.3d 862,

14   893–95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered

15   defendant's efforts to challenge every important element of proof offered by prosecution). Here,

16

17   _____

     [16] In searching the record, the Court was able to locate only two rulings regarding this evidence,
18   and both were quite benign. First, the trial court granted the prosecutor's request that the
     transcript of the recording be redacted to eliminate time data (*i.e.*, minutes and seconds at which
19   each sentence was spoken) so the jury would not see where redactions had been made. RT 6580-
     82. Second, during a session near the end of trial where the court went through the exhibits with
20   the attorneys to address which exhibits were admitted and which were not, the trial court ruled that
     Exhibit A-503 (*i.e.*, the unredacted transcript) had been marked for identification but "is not
21   admitted," while Exhibit A-504 (*i.e.*, "the transcript as redacted to show the portions that were
     played before the jury") was admitted into evidence, but "will only be given to the jury if they
22   request to play the DVD". RT 6689. Petitioner did not identify any ruling by the court granting a
     request for other redactions or overruling any objection thereto by the defense.
23
             Petitioner did submit with his supplemental brief (Docket No. 50) a copy of portions of the
24   unredacted transcript of the recording, apparently to show the important parts that were not
     admitted into evidence. *See* Docket No. 50-1 at 81-97. But the only portion of the unredacted
25   transcript petitioner submitted with his supplemental brief that was not part of the redacted
     transcript is a very short portion at the beginning of the recording before petitioner's codefendant
26   was even present. *Compare* Docket No. 50-1 at 84-85 (CT 4483-84 (unredacted transcript)) *with*
     CT 4540 (redacted transcript starts with entry 43). The redacted portion is the part where the
27   borrower-victim Sergio Sanchez is speaking with someone – probably an investigator – named
     "Cristina" as they drive to, park and prepare to enter the building for their meeting with
28   codefendant Valverde. Petitioner was not part of the unredacted or redacted recording.

1    there were not multiple federal constitutional trial errors to accumulate.  Mr. Covarrubias therefore

2    is not entitled to relief under the cumulative error doctrine.

3    N.    Claims 17 and 19: Ineffective Assistance of Trial Counsel

4          Mr. Covarrubias claims he was deprived of his Sixth Amendment right to effective

5    assistance of trial counsel.  In Claim 17, he contends that counsel was ineffective in that he did not

6    use evidence of the borrowers' bad acts against those borrowers.  He alleges that many of the

7    borrowers, such as Francisco Lopez and Maria Reyes, had used fake social security cards to

8    initially purchase their properties.  In Claim 19, he contends that trial counsel was ineffective in

9    failing "to call William Russell to testify because of possible conflict of interest.  Co-counsel

10   Frank Ubhaus had previously repr[es]ented William Russell."  Docket No. 1 at 12.  Mr. Russell

11   allegedly "had signed the 1003 loan applications of indicted counts, he was also the broker of

12   record."  Docket No. 1 at 12.  Mr. Russell's testimony allegedly would have allowed the jury to

13   see that being the broker of record "did not mean that there was a conspiracy."  *Id.*

14         The Sixth Amendment's right to counsel guarantees not only assistance, but effective

15   assistance, of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for

16   judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

17   functioning of the adversarial process that the trial cannot be relied upon as having produced a just

18   result.  *Id.*  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

19   must establish two things.  First, he must demonstrate that counsel's performance was deficient

20   and fell below an "objective standard of reasonableness" under prevailing professional norms.  *Id*

21   at 687-88.  Second, he must establish that he was prejudiced by counsel's deficient performance,

22   i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

23   of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is a probability

24   sufficient to undermine confidence in the outcome.  *Id.*

25         A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of

26   counsel claims under § 2254.  *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).  The "question

27   is not whether counsel's actions were reasonable.  The question is whether there is any reasonable

28   argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, 562 U.S.

United States District Court
For the Northern District of California

86, 105 (2011).

The California Supreme Court's summary denial of Mr. Covarrubias' claims was not contrary to, or an unreasonable application of, *Strickland*.  That court reasonably could have rejected the ineffective assistance of counsel claim on either or both prongs of *Strickland*.  Mr. Covarrubias does not explain here, and did not explain in his state habeas petition, how or why the borrowers' alleged misuses of Social Security cards on their initial property purchases would have affected the jury's evaluation of Mr. Covarrubias' activities as a refinancing mortgage broker.  The two borrowers he identifies, Maria Reyes and Francisco Lopez, were extensively cross-examined. More than half of the 206 pages of the transcript of Ms. Reyes' testimony and more than half the 236 pages of the transcript of Mr. Lopez's testimony were cross-examination by the several defendants.  *See* RT 3242-3257, 4447-4483.  Mr. Covarrubias fails to show that the additional area of inquiry would have made a difference in the jury's assessment of these two witnesses' credibility.  Additionally, he was not even convicted of an offense against Maria Reyes, and he does not explain how further cross-examination of her would have made any difference to his case.  *See* CT 3880 (Count 3 listing Maria Reyes as a victim only lists Ms. Valverde as a defendant).  CT 3880.

The California Supreme Court reasonably could have rejected Mr. Covarrubias' claim based on the failure to call Mr. Russell as a witness due to the conclusory nature of the allegation and absence of any evidentiary support for it.  Further, Mr. Covarrubias fails to mention here or in his state habeas petition that the underlying conflict that supposedly kept Mr. Covarrubias' attorney from calling Mr. Russell as a witness was resolved before trial.  Mr. Russell was listed as a prosecution witness, and the prosecutor filed a motion seeking an inquiry about the conflict potential based on the fact that Mr. Ubhaus (Ms. Valverde's attorney) earlier had represented Mr. Russell.  CT 3340,  Those pretrial proceedings resulted in an order allowing "Mr. Ubhaus to continue to represent defendant Esperanza Valverde with back up counsel to cross-examine those witnesses," i.e., Theresa Saldivar and William Russell, who had declined to waive a conflict.  CT 3471; *see also* CT 3468 (witnesses refused to waive a conflict).  Although Mr. Covarrubias states that the conflict kept his attorney from calling Mr. Russell as a witness, the trial court's ruling had

the effect of eliminating any concern about that conflict.  That, in turn, makes Mr. Covarrubias'

contention that the conflict motivated his counsel's decision mere speculation.  Mr. Covarrubias

also does nothing more than speculate in asserting that testimony by Mr. Russell would have

allowed the jury to "see that just because you were the broker of record that did not mean that

there was a conspiracy," Docket No. 1 at 12, or that Mr. Russell's testimony would have been

helpful to his defense.  A defendant's mere speculation that a witness might have given helpful

information is not enough to establish ineffective assistance.  *See Bragg v. Galaza*, 242 F.3d 1082,

1087-89 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001) (failure to interview a witness not

shown to be prejudicial where petitioner "does nothing more than speculate that, if interviewed

[the witness] might have given information helpful to" the defendant).

Bearing in mind that Mr. Covarrubias' presentation in the California Supreme Court was

just as cursory as his presentation here, this Court concludes that "it would have been reasonable"

for the California Supreme Court to find that Mr. Covarrubias "had not shown his attorney was

deficient under *Strickland*," and that Mr. Covarrubias "fell short" of showing that it was

reasonably likely the result would have been different had counsel made the inquiries of the

borrowers and called Mr. Russell as a witness.  *Harrington v. Richter*, 562 U.S. at 111.  Mr.

Covarrubias is not entitled to the writ on these claims.

O.     Claims 18 and 20: Challenge To Conspiracy

In Claim 18, Mr. Covarrubias contends that his rights under the Fifth and Eighth

Amendments were violated because "a single conspiracy was unconstitutionally used to impose a

sentence for multiple conspiracies."  Docket No. 1 at 11.  The "supporting facts" for this claim are

that the prosecutor used as evidence for "their conspiracy theory" broker agreements that were

actually filled out by the lender underwriters rather than the brokers without having the lender

underwriters testify so that the defense could cross examine them.  In Claim 20, he alleges that his

right to due process was violated because the prosecutor misled the jury by presenting "the 1003

loan applications [that] were not signed by petitioner."  *Id.* at 12.  He alleges that the "prosecutor

used a blanket statement that the broker/petitioner was involved and knew about all the loan

transactions and that he was in a conspiracy.  This is simply not true."  *Id.*  In his supplement to

the traverse, he directs the reader to Exhibit 13 for evidence in support of his claims.  See Docket No. 50 and Ex. 13.  Exhibit 13 is a mid-trial defense motion to dismiss or for a mistrial based on prosecutorial misconduct, in which the defense complained about the entirety of the prosecution and accused the prosecutor of turning a blind eye to the conduct of the borrower victims "in an effort to present them as innocents when in fact they each had substantial experience with real estate transactions, and had a history of fraudulent conduct in connection with those transactions." Docket No. 50-1 at 50.  The motion to dismiss or for a mistrial urged that "[b]ringing out the truth was left to the defense."  *Id.* at 51.  The motion covered many of the claims already discussed in this order (such as the exclusion of third-party lending practices and the presentation of the case to the grand jury), and faulted the prosecutor for not disbelieving the borrowers (who the defense strenuously contended were not actual victims) or recognizing that some of the victims made money on the transactions.  The trial court denied the motion; while declining to make individual findings, the court did "find there's no basis for the motion."  RT 6804.

Respondent answers that he cannot understand enough of what Mr. Covarrubias is arguing and that the claim is too vague and conclusory to support either state or federal habeas relief.  The Court agrees.  The allegations pertaining to a "conspiracy" are too vague and conclusory to support habeas relief.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief").

Mr. Covarrubias' contention that the prosecutor engaged in misconduct in that she "used a blanket statement that the broker/petitioner was involved and knew about all the loan transactions" which, in his view, is "simply not true," also fails.  Mr. Covarrubias fails to identify where in the record that statement was made, and fails to show that it was not true.  His allegation essentially suggests he disagrees with the prosecutor's assertion that he is guilty of the charged offenses.  But disagreeing with the prosecutor's view of the case does not establish prosecutorial misconduct. Petitioner does not provide enough information for the court to understand and formulate an analysis of his conspiracy argument.

Mr. Covarrubias fails to show specifically what the prosecutor did that amounted to more than vigorous advocacy.  Under *Darden*, the petitioner must show that the prosecutor's acts "'so

infected the trial with unfairness as to make the resulting conviction a denial of due process'" to

obtain habeas relief.  477 U.S. at 181.  Bearing in mind that the "*Darden* standard is a very general

one, leaving courts 'more leeway . . . in reaching outcomes in case-by-base determinations,"

*Parker*, 132 S. Ct. at 2155 (omission in original), this Court concludes that the California Supreme

Court's summary rejection of Mr. Covarrubias' claim was not contrary to, or an unreasonable

application of clearly established law as set forth by the Supreme Court.  He is not entitled to the

writ on the claims.

P.      No Certificate of Appealability

         A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

which "reasonable jurists would find the district court's assessment of the constitutional claims

debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of

appealability is **DENIED**.

### VI.      CONCLUSION

         For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits.

The Clerk shall close the file.


         **IT IS SO ORDERED**.


Dated: April 19, 2016

                                                      _____

                                                      EDWARD M. CHEN
                                                      United States District Judge